UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
MICHELLE PETTIT a/k/a ANGEL SHULER,

                                 Plaintiff,

                 -against-

COUNTY OF NASSAU, NASSAU COUNTY SHERIFF
ANTHONY J. LAROCCO, in his individual and official
capacities, CORPORAL KNIGHT, in her individual and
official capacities, and NASSAU COUNTY
CORRECTIONS OFFICER JOHN DOES #1-10
(fictitiously named), in their individual and official
capacities,

                                 Defendants.
------------------------------------------------------------------------ X

**Docket No.:**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff MICHELLE PETTIT a/k/a ANGEL SHULER, by her attorneys, HORN WRIGHT, LLP, complaining of Defendants COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY LAROCCO, in his individual and official capacities, CORPORAL KNIGHT, in her individual and official capacities, and NASSAU COUNTY CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities, alleges as follows:

## PRELIMINARY STATEMENT

1.       This is a civil rights action in which Plaintiff, MICHELLE PETTIT a/k/a ANGEL SHULER ("PETTIT" and/or "Plaintiff") seeks relief from Defendants COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY LAROCCO, in his individual and official capacities, CORPORAL KNIGHT, in her individual and official capacities, and NASSAU COUNTY CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities (collectively, "Defendants" or "County Defendants") for committing acts under

color of law and depriving Plaintiff of rights secured under 42 U.S.C. § 1983 grounded in rights secured to her under the First, Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.

2.     Plaintiff alleges that County Defendants engaged in unlawful conduct. Specifically, during the course of Plaintiff's pre-trial detention at the Nassau County Correctional Center, Plaintiff was denied access to medical treatment and subjected to inhumane conditions that pose unreasonable and substantial risks to her health, causing physical harm and extreme pain and suffering in violation of Plaintiff's Constitutional rights.

3.     Plaintiff seeks damages, both compensatory and punitive, award of costs and disbursements, interest, attorney's fees, and such other and further relief as this Court deems just and equitable.

## JURISDICTION

4.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, the ADA, and the Rehabilitation Act. Plaintiff further brings this action, pursuant to 42 U.S.C. § 1983 and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), to challenge the unlawful treatment of Muslim detainees and individuals diagnosed with gender dysphoria at Nassau County Correctional Center. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983 and by 28 U.S.C. §§ 1331 and 1343(3) and (4) of the aforementioned Constitutional provisions.

5.     Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

## VENUE

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) since all of the events and omissions giving rise to Plaintiff's claims occurred within the County of Nassau in the Eastern District of New York; the actual place of employment of the individually named Defendants and Doe Officers is within the County of Nassau in the Eastern District of New York; and the County of Nassau is within the jurisdiction of the Eastern District of New York.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

7.      Plaintiff served a Notice of Claim upon County on July 23, 2025, within ninety days of the events giving rise to her claims.

8.      Defendant COUNTY OF NASSAU conducted a hearing pursuant to NY Gen. Mun. Law § 50-h on February 27, 2026.

9.      More than thirty days have elapsed since Plaintiff served her Notice of Claim and COUNTY OF NASSAU has not offered adjustment or payment thereof

## THE PARTIES

10.      Plaintiff MICHELLE PETTIT a/k/a ANGEL SHULER was and still is a resident of the County of Nassau, State of New York. At all relevant times described herein, Plaintiff was a pretrial detainee in the custody and care of Defendants.

11.      Upon information and belief, at all relevant times described herein, Defendant COUNTY OF NASSAU ("COUNTY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

12.      Upon information and belief, at all relevant times described herein, Defendant COUNTY, by its agents and/or employees, operated, maintained, and controlled the Nassau

3

County Sheriff's Department ("NCSD"), including the Nassau County Correctional Center ("NCCC") and all corrections officers thereof, and is responsible for providing a safe and secure environment for detainees in its custody. COUNTY is charged by the laws of the State of New York with authority to maintain the NCCC and is responsible for its confinement conditions and for the treatment of its inmates.

13.    At all relevant times herein, Defendant NASSAU COUNTY SHERIFF ANTHONY LAROCCO ("LaROCCO") was and is the Sheriff of the County of Nassau, acting under color of state law, and is responsible for providing a safe and secure environment for detainees in his custody. LaROCCO is being sued in his individual and official capacities. LaROCCO is responsible for the day-to-day operations of NCCC. As Sheriff, he has the custody, control, and charge of the NCCC and its detainees. LaROCCO is legally responsible, in whole or in part, for the operation of the NCCC, for the conditions therein, and the health and safety of persons confined or detained therein. As Sheriff, LaROCCO has final policy-making authority for all matters relating to the operation of NCCC, including final policy-making authority and ultimate responsibility for the custody, treatment, control, and care of all persons detained in NCCC. The individuals working at NCCC are LaROCCO's agents and employees.

14.    Upon information and belief, at all relevant times described herein, Defendant CORPORAL KNIGHT ("KNIGHT") is an individual employed by COUNTY with an actual place of employment within the County of Nassau, State of New York, who is being sued in her individual and official capacities. At all relevant times described herein, KNIGHT was acting under color of state law within the scope of her employment as a supervisor employed by Defendant COUNTY, and works under the supervision, direction, and/or control of the supervisors in NCSD and NCCC.

4

15.     Upon information and belief, at all relevant times described herein, Defendant NASSAU COUNTY CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named) ("DOES") are individuals and employees of Defendant COUNTY with an actual place of employment within the County of Nassau, State of New York, who are being sued in their individual and official capacities. At all relevant times described herein, DOES were acting under color of state law and within the scope of their employment as corrections officers, sergeant(s), corporal(s), and/or supervisor(s) employed by Defendant COUNTY, and work under the supervision, direction, and/or control of their supervisors in the NCSD and NCCC.

16.     Defendants KNIGHT and DOES are collectively referred to as the "Individual Defendants".

## FACTUAL ALLEGATIONS

17.     At all relevant times herein mentioned, NCCC is an agency, subdivision, and/or instrumentality of COUNTY, located at 100 Carman Avenue, East Meadow, New York.

18.     At all relevant times herein mentioned, NCCC was owned, operated, managed, maintained, controlled, and/or repaired by COUNTY, through its agents, servants, employees, and/or assigns.

19.     At all relevant times herein mentioned, it was the duty of COUNTY, through its agents, servants, employees, and/or assigns, to operate, maintain, manage, supervise, repair, and control the NCCC.

20.     Beginning on or about March 9, 2025 or March 10, 2025, and at all relevant times herein, Plaintiff was lodged at NCCC.

21.     Plaintiff is Muslim, has been diagnosed with gender dysphoria, and has been transitioning from female to male for the past three years.

22. Throughout her detention at NCCC, Plaintiff experienced various forms of discrimination, harassment, and interference with her ability to practice Islam and denied competent and adequate medical care, as set forth herein.

23. Defendants have established a preference for non-Muslim inmates at NCCC by providing them with opportunities for preferred privileges. In addition, Defendants substantially burdened Plaintiff's religious exercise by refusing to accommodate her religious dietary restrictions and forbidding her from participating in group prayer, both of which are integral to Islamic faith and worship. Plaintiff seeks damages for the violations of her federal Constitutional and statutory rights

24. As a practicing Muslim, Plaintiff seeks to engage in traditional Muslim religious practices, including weekly communal prayer, regular meetings with an imam, and adherence to specific dietary restrictions. The aforementioned practices are recognized to be traditional Muslim practices.

25. An imam is a Muslim spiritual leader who guides the community by leading prayers, interprets the Quran, provides religious guidance on personal matters, and acts as a link between the people and Allah. An imam offers a source of knowledge and support in the Muslim detainees' daily lives, acting as a trusted advisor on faith and practice.

26. Regular access to an imam is important to Plaintiff because the imam guides Plaintiff in her faith and offers spiritual support and counseling.

27. As set forth herein, Defendants prevented Plaintiff from engaging in these traditional practices and thereby imposed substantial burdens on her, and all Muslim detainees', free exercise of religion.

28. Communal prayer is important to Plaintiff because it allows her to be united with fellow Muslims and to express their faith together.

29. Defendants have refused to provide Plaintiff with any opportunity to share communal prayers after the restricted services with other Muslim inmates.

30. Plaintiff, and the other individuals like Plaintiff, have submitted requests to participate in communal prayers, but Defendants have repeatedly ignored those requests

31. As a practicing Muslim, Plaintiff also subscribes to religious dietary laws that prohibit the consumption of foods not considered *halal*.

32. Defendants have a policy and/or custom that treats Muslim inmates less favorably than similarly situated Jewish inmates with regard to diets. Jewish inmates who request kosher diets are provided with kosher meals that include meat. However, Muslim inmates who request *halal* diets are frequently denied *halal* meals.

33. In accordance with Islamic law, Plaintiff fasts during the holy month of Ramadan, refraining from eating or drinking from dawn until dusk. Defendants' policies and/or customs substantially burden Plaintiff's fasting ritual by denying Plaintiff sufficient meals during the portions of the day when she is permitted to eat.

34. As a result of Defendants' policies or customs, Muslim inmates, including Plaintiff, are denied access to ritual food items for holy day observances, even when such items can be procured at little or no expense to COUNTY.

35. While COUNTY asserts to have a contract with a vendor that is supposed to provide *halal* meals, and particular *halal* meals during the month of Ramadan, these supposed meals have not been provided to Plaintiff and/or other Muslim inmates.

7

36.     Upon information, these policies and customs of Defendants are an attempt to discourage, hinder and/or prevent Muslim inmates from practicing their religion and thus provide a substantial burden on Plaintiff's ability to practice her religion.

37.     As a result of the policies and/or customs of Defendants, Muslim inmates, including Plaintiff, have been and continue to be denied integral practices of Islam such as meaningful opportunities to congregate for prayer and religious study and adherence to *halal* restrictions, while non-Muslim inmates enjoy such opportunities on a regular basis.

38.     Plaintiff has been diagnosed with gender dysphoria and has been transitioning from female to male for the past three years. Plaintiff's gender affirming medical treatment restricts Plaintiff's diet, requiring it be free of soy and soy-based products because soy can cause adverse food-drug interactions with Plaintiff's gender-affirming treatment.

39.     Defendants refused to provide Plaintiff with a soy-free diet, and the consequent consumption of soy products caused Plaintiff to develop boils, cysts, abscesses, hot flashes, cold sweats, delirium, confusion, and emotional outbursts.

40.     As part of her gender-affirming treatment, Plaintiff also requires weekly injections of 100 milligrams of testosterone.

41.     Plaintiff's diagnosis of gender dysphoria qualifies her as an individual with a disability as defined by the ADA and the Rehabilitation Act.

42.     In violation of the ADA and the Rehabilitation Act, Defendants either failed and/or refused to provide Plaintiff with necessary weekly injections. In the instances where injections were provided, they were with dull and previously used needles and/or incorrect lower dosages, at times as low as 40 milligrams. For reference, patients beginning gender affirming care receive 90 milligrams.

43.     Defendants have a duty to provide competent medical and custodial care to their pre-trial detainees.

44.     Due to Defendants' deliberate indifference to Plaintiff's serious medical needs and denial of gender-affirming treatment, Plaintiff experienced severe and permanent injuries such as mental breakdowns, suicidal ideations, confusion, detachment, changes to her physical appearance, shock, PTSD, boils, cysts, abscesses, hot flashes, cold sweats, delirium, confusion, and emotional outbursts.

45.     Plaintiff has been unable to resume her regular treatment because her body continues to adjust to and recover from the consequences of repeatedly missed or improperly low-dose injections.

46.     Another consequence of Defendants' refusal to provide proper medical treatment was the return of Plaintiff's menstrual cycle. Defendants nevertheless refused to provide Plaintiff with menstrual products, forcing Plaintiff to rely on other detainees for such products. When DOES discovered this, they prohibited other detainees from providing Plaintiff with menstrual products by claiming none were available.

47.     Defendants' interference with Plaintiff's hygiene extended to withholding and denying Plaintiff access to showers. Defendants would claim Plaintiff had engaged in a verbal disagreement and, on that basis, would confine Plaintiff to her cell for the remainder of the day.

48.     Throughout Plaintiff's detention at NCCC, she repeatedly made sick calls, contacted internal affairs, and grieved the aforementioned issues.

49.     Plaintiff submitted weekly grievances for a proper medical exam and treatment, and to meet with the imam.

9

50. However, Plaintiff, as well as other detainees, lack the ability to meaningfully grieve conditions at NCCC.

51. Defendants denied Plaintiff access to a proper grievance process.

52. Defendants employ a policy of "front-desking". In other words, Defendants encourage and/or dissuade Plaintiff, and other detainees, from actually filing a grievance. That is, grievances are either not accepted, not allowed, not collected, thrown in the garbage, or not provided to Plaintiff and others.

53. Defendants either deny the grievance on absurd procedural grounds or delay detainees, such as Plaintiff, from filing the grievance by either not providing the proper forms, not accepting the grievance, or not collecting the grievance so that when the grievance reaches the purported grievance coordinator it is deemed untimely and summarily rejected.

54. Defendants further restrict detainees, such as Plaintiff, from fully exhausting the administrative process by refusing to accept and/or permit an appeal of the grievance coordinators' determination.

55. By way of example, the grievance coordinator will at times withhold the grievance form and indicate that the detainee accepted the determination but refused to sign the grievance form when in truth a detainee wanted to check-off the "appeal" box.

56. In other instances, the grievance coordinator may accept the grievance, but no corrective action is taken by the facility. Thus, a detainee is left to have to continuously grieve an issue without Defendants correcting or addressing the issue complained of. Defendants will then begin to deny and/or reject the grievance due to the grievance having already been "addressed" by Defendants.

57.    When a detainee, such as Plaintiff, attempts to appeal a grievance despite Defendants' obstructionist conduct, the appeal officer will summarily deny the appeal for purportedly not following the proper process, being vague, or some other hyper-technical absurdity.

58.    The grievance process is crucial for ensuring fair treatment of detainees, providing a formal channel for complaints, potentially preventing lawsuits, and in having and maintaining an orderly facility. It allows detainees to voice concerns about conditions or treatment and provides a mechanism for resolving issues before they escalate into more serious problems or legal disputes. It further prevents minor issues from escalating into larger problems, avoiding conflict between detainees, avoiding conflict between detainees and corrections officers, and avoids violence and disturbances at the facility.

59.    Due to Plaintiff's frequent sick calls and grievances, DOES began withholding Plaintiff's medical treatment, including the necessary gender-affirming injections and psychiatric medications. Defendants used Plaintiff's medical needs as a system of rewards and punishments.

60.    As a consequence of not receiving the necessary medical treatment, Plaintiff experienced violent emotional outbursts and physical complications. In one instance, due to Plaintiff not receiving the necessary injections, Plaintiff broke a window, so DOES falsely claimed she had had an adverse reaction to her testosterone injections, and unilaterally decreased her dosage.

61.    Defendants' conduct subjected Plaintiff to ongoing irreparable harm and further had the effect of denying Plaintiff, and others, the ability to redress Defendants' unlawful conduct in the Courts.

62.    For years, the detainees in NCCC have submitted grievances through NCCC's complaint procedures describing these conditions.

63.    These grievances, as detailed herein, have been ignored and/or "front-desked" by Defendants.

64.    Defendants have also systematically and deliberately ignored and/or failed to take reasonable measures to address the complaints about the inhumane, deplorable, and unconstitutional violations and conditions at NCCC.

65.    In 1990, Nassau County residents overwhelmingly approved an amendment to the Nassau County Charter to establish the Nassau County Correctional Center Board of Visitors ("Board of Visitors").

66.    The Board of Visitors was to be a seven-member independent oversight committee meant to respond to inmate grievances and advise the Sheriff on programs that would improve the care and treatment of detainees housed at NCCC. Since then, Defendant COUNTY has consistently failed to appoint members to the Board of Visitors.

67.    In April of 2013, after a suit brought by the New York Civil Liberties Union ("NYCLU"), Defendant COUNTY was ordered to comply with the Nassau County Charter mandate. In his decision, Judge James P. McCormack stated that "the language of the Charter is unequivocal and it clearly directs the County Executive to fill the seven member Board of Visitors in a manner consistent with the Nassau County Charter." *Marone, et al. v. Nassau County, et al.*, 003630/2012 (NC. Sup. 2013)

68.    Upon information, Defendant COUNTY has not fully implemented the Board of Visitors. Per Defendant COUNTY's own website, the Board of Visitors' last meeting was held on

January 28, 2021. *See* https://www.nassaucountyny.gov/4413/Nassau-County-Correctional-Center-Board-.

69. The Board of Visitors is to serve three-year terms and have some "working knowledge of the correctional system." The committee is required to have an office at the jail and access to jail records, books, and data. Board of Visitor members would be appointed by the County Executive and serve without compensation.

70. The entire purpose of the Board of Visitors is to have independent oversight of the NCCC which is unquestionably needed given the present conditions at NCCC.

71. Defendants are well aware of the conditions at NCCC and the treatment of detainees housed therein.

72. COUNTY, through NCSD and the County Executive, have engaged in a pattern and practice of deliberate indifference to the ongoing inhumane and unconstitutional conditions at NCCC.

73. Defendants knew or should have known that NCCC was not properly operated and/or maintained, has been permitted to fall into total disrepair, and that this continued failure to address the problem has reached desperate proportions.

74. The foregoing policies, acts, inactions, omissions, and systematic failures are the official policies, practices, and customs of Defendants. The foreseeable result of these policies, practices, and customs was the further deterioration of the already inhumane conditions at NCCC.

75. Defendants have been deliberately indifferent to the unconstitutional conditions at NCCC and established a policy, practice, and/or custom of approving and tolerating the unconstitutional conditions by refusing to remediate them.

76. Despite knowledge of such unlawful policies, practices, and/or customs, Defendants' policy-making officials and officials with oversight responsibilities over NCCC have not taken steps to terminate or remediate these policies, practices, and/or customs, and instead have supported, ratified, or implemented these policies, practices, and/or customs through their active encouragement or deliberate indifference to the effect of such policies, practices, and/or customs upon the Constitutional rights of persons in their care or custody.

77. As a direct and proximate result of Defendants' persistent and widespread practice and official policy of failing to address these violations, the detainees in NCCC have been forced to live in inhumane conditions that deprive them of their Constitutional rights.

78. Defendants' intentional, reckless, negligent, or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

79. Defendants were aware and knew and/or had reason to know of the substantial risk to Plaintiff, and individuals like Plaintiff, to her physical and mental health and safety. Despite this knowledge, Defendants disregarded said risk.

80. Defendants were well aware of the inhumane, toxic, and dangerous conditions at NCCC but failed to take any measures to correct same.

81. Defendants' intentional, reckless, grossly negligent, negligent, or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

82. The injuries Plaintiff suffered were caused solely by the conduct of Defendants, and Plaintiff in no way contributed to or caused the injuries she suffered.

83. Defendants' intentional, reckless, negligent, or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

14

84.     Defendants were aware and knew and/or had reason to know of the substantial risk to Plaintiff, and individuals like Plaintiff, to her physical and mental health and safety. Despite this knowledge, Defendants disregarded said risk.

85.     Defendants were well aware of the inhumane, toxic, and dangerous conditions at NCCC but failed to take any measures to correct and/or repair same.

86.     Defendants' conduct was the proximate cause of Plaintiff's injuries.

87.     The injuries suffered by Plaintiff are permanent in nature.

**COUNT I**
**VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT**
(*Against All Defendants*)

88.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

89.     Defendants have violated and continue to violate the Free Exercise Clause of the First Amendment to the United States Constitution by prohibiting Plaintiff from freely exercising her religion.

90.     Plaintiff challenges the violation of her First Amendment rights under 42 U.S.C. § 1983.

91.     As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to sustain mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

**COUNT II**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE**
**FOURTEENTH AMENDMENT**
(*Against All Defendants*)

92.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

93.     Defendants have violated and continue to violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, having discriminated against Plaintiff on the basis of religion and gender identity in areas such as religious and medical diet accommodations, medical treatment, jail privileges, access to religious literature, and opportunities for congregate worship.

94.     Plaintiff challenges the violation of her Fourteenth Amendment rights under 42 U.S.C. § 1983.

95.     As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to sustain mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

**COUNT III**
**VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT**
(*Against All Defendants*)

96.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

16

97.     Defendants have violated and continue to violate the Establishment Clause of the First Amendment to the United States Constitution by providing preferential treatment to inmates of Judeo/Christian based religions that promote Judaism and Christianity, and provides privileges and opportunities to such detainees that are not available to Muslim or transgender detainees.

98.     Plaintiff challenges the violation of her First Amendment rights under 42 U.S.C. § 1983.

99.     As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to sustain mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

## COUNT IV
## VIOLATION OF THE ADA AND THE REHABILITATION ACT
### (*Against All Defendants*)

100.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

101.    Section 201(1) of the ADA, 42 U.S.C. § 12132, provides that a "public entity means (A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government."

102.    At all times relevant to this action, Defendant COUNTY is a public entity within the meaning of Title II of the ADA.

103.    Section 201(2) of the ADA, 42 U.S.C. § 12132, provides that a "qualified individual

17

with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

104. Gender dysphoria is the severe physiological distress that can arise when an individual's gender identity differs from the sex assigned to them at birth. This distress can substantially affect a person's mental health and daily functioning, and requires ongoing medical treatment.

105. At all times relevant to this action, Plaintiff was diagnosed with gender dysphoria and thus is a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2), and the Rehabilitation Act, 29 U.S.C. § 794.

106. At all times relevant to this action, the ADA, 42 U.S.C. §§ 12101, *et seq.* and the Rehabilitation Act, 29 U.S.C. § 794, were in full force and effect and applied to Defendants' conduct in their dealings with Plaintiff.

107. At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 CFR 35, were in full force and effect and applied to Defendants' conduct in their dealings with Plaintiff.

108. The objective of the ADA is to eliminate discrimination against individuals with disabilities. Section 202 of the ADA, 42 U.S.C. § 12132, provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

109.    Under the federal regulations promulgated pursuant to the Americans with Disabilities Act, a public entity must provide disabled individuals with effective medical treatment, including hormone replacement therapy.

110.    Defendants violated the ADA and the Rehabilitation Act, 29 U.S.C. § 794, and their regulations in failing to ensure that their medical services, evaluations, and examinations were accessible to qualified individuals with disabilities, and Plaintiff in particular, through necessary hormone replacement therapy; in failing to provide qualified individuals with disabilities, and Plaintiff in particular, with the opportunity to access medical providers and services; in failing to assure that medical services would be available 24 hours a day; and in failing to give primary consideration to the requests of qualified individuals with disabilities, and Plaintiff in particular, in ensuring properly administered hormone replacement therapy.

111.    Defendants, their agents, servants, and/or employees, denied Plaintiff the benefits of their medical services, evaluations, and examinations, and subjected her to discrimination solely on the basis of her disability at the time of her detainment and period of confinement in failing and refusing to provide her with effective access to medical services, evaluations, and examinations; in failing to provide Plaintiff with the same law enforcement and/or corrections' services that Defendants provide to other non-disabled persons, detainees, and incarcerated individuals; in failing to provide Plaintiff with other effective means of access which would enable Plaintiff to have the same opportunities as were available to non-disabled detainees and/or incarcerated individuals; in failing to provide Plaintiff with the same opportunities as were provided to non-disabled individuals; and in causing Plaintiff to be isolated and humiliated due to the lack of effective medical services, evaluations, and examinations during her arrest and period of confinement.

112.    Defendants' failure to provide hormone replacement therapy, as hereinbefore alleged, constituted discrimination against Plaintiff on the basis of disability in violation of Title II of the ADA.

113.    Defendants' violations of Title II of the ADA mentioned above deprived Plaintiff of hormone replacement therapy, to which she was entitled, and were intentional and the product of Defendants' deliberate indifference to the strong likelihood that their policies and conduct would likely result in a violation of federally protected rights.

114.    The actions and omissions of Defendants and/or their agents, servants, and employees occurred under circumstances giving rise to an inference of discrimination.

115.    Defendants, their agents, servants, and/or employees, intentionally discriminated against Plaintiff and/or were deliberately indifferent towards Plaintiff's rights.

116.    The intentional nature of the violations of the ADA on the part of Defendants, their agents, servants, employees, and correction officers, and their deliberate indifference is demonstrated by the fact that their conduct, as hereinbefore alleged, constituted a direct violation of the provisions of the ADA, a statute in effect for more than 25 years prior to the events complained of herein, and its regulations as well as policies and procedures promulgated by LaROCCO and/or his authorized representatives.

117.    As a direct and proximate result of Defendants' discriminatory conduct. Plaintiff suffered adverse consequences and was caused to endure boils, cysts, abscesses, hot flashes, cold sweats, delirium, confusion, emotional outbursts, severe injuries, extreme anxiety, humiliation, depression, and emotional pain, all to her damage. Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury as a result of Defendants' patterns and practices of discrimination. Plaintiff has thereby been damaged by the violation of the ADA on the part of

Defendants, their agents, servants, and/or employees, and demands compensatory damages, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

**<u>COUNT V</u>**
**<u>VIOLATION OF THE RELIGIOUS LAND USE AND</u>**
**<u>INSTITUTIONALIZED PERSONS ACT (RLUIPA)</u>**
**(*<u>Against All Defendants</u>*)**

118.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

119.    Defendants have denied and continue to deny Plaintiff the ability to practice her religion.

120.    This denial substantially burdens Plaintiff's religious exercise in violation of RLUIPA.

121.    RLUIPA provides:

    a.  In general:
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

    b.  Exception:
Government may substantially burden a person's exercise of religion only if it demonstrates that application to the burden to the person –
        1.  is in furtherance of a compelling governmental interest; and
        2.  is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1.

122.    Plaintiff is a "person[s]" as that term is used in RLUIPA. 42 U.S.C. § 2000cc1(a), 42 U.S.C. § 1997(3).

123.    Plaintiff is confined to NCCC, which is an "institution" as defined in 42 U.S.C. § 1997(1).

124. Defendant COUNTY is a "government" as that term is defined in RLUIPA, 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii), and each of the Individual Defendants are agents of COUNTY.

125. Under RLUIPA, COUNTY may not impose a "substantial burden" on the "exercise of religion" unless it can demonstrate that the burden is the "least restrictive means" to advance a "compelling governmental interest."

126. Defendants' denials of Plaintiff's ability to engage in exercise of her religion impose a "substantial burden" on Plaintiff's "exercise of religion."

127. Defendants cannot satisfy their burden of demonstrating that the substantial burdens on Plaintiff's religious exercise are the "least restrictive means" to achieve a "compelling governmental interest."

128. As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to sustain mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

**COUNT VI**
**DELIBERATE INDIFFERENCE TO PAST, CURRENT, AND ONGOING UNCONSTITUTIONAL CONDITIONS AT NCCC UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS**
***(Against All Defendants)***

129. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

130. The Eighth Amendment to the United States Constitution requires that state actors take reasonable measures to guarantee the safety and well-being of inmates in their custody.

131. The Due Process Clause of the Fourteenth Amendment affords pretrial detainees at least the same rights as those afforded to convicted prisoners, if not greater rights. In light of the totality of the circumstances discussed in detail above, Defendants - acting under color of state law - have subjected Plaintiff to conditions of confinement that expose Plaintiff to a substantial risk of serious physical and psychological harm and, as such, constitute unlawful punishment in violation of the Fourteenth Amendment.

132. In light of the totality of the circumstances discussed above, Defendants - acting under color of state law - have subjected Plaintiff to inhumane conditions that have exposed and continue to expose Plaintiff and other inmates to a substantial risk of serious physical, psychological, and emotional harm and, as such, constitute cruel and unlawful punishment in violation of the Eighth and Fourteenth Amendments.

133. Defendants possess the ability to remedy the hazardous and inhumane conditions in question, but have willfully failed to do so. In fact, their actions have exacerbated the risk of harm or injury to the inmates. Defendants have failed to address the ongoing violations and complaints, thereby increasing the likelihood of injury.

134. Defendants have subjected and continue to subject Plaintiff to cruel and inhumane prison conditions that damaged her, which pose an unreasonable and unjustifiable risk of harm to her health, and have manifested and continue to manifest a pattern of deliberate indifference to this damage and risk of harm. The challenged conditions violate the Eighth and Fourteenth Amendments to the United States Constitution.

135.    As a result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

**COUNT VII**
**VIOLATION OF PLAINTIFF'S FOURTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS FOR FAILURE TO SUPERVISE AND FAILURE TO TRAIN (§ 1983)**
**(*Against Defendants COUNTY and LaROCCO*)**

136.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

137.    The unlawful treatment of vulnerable inmates by corrections officers, including KNIGHT and DOES, is and was foreseeable.

138.    Defendants COUNTY and LaROCCO were responsible for supervising, overseeing, and controlling their subordinates in NCCC, including KNIGHT and DOES.

139.    Defendants COUNTY and LaROCCO had an express and/or implied duty to provide a reasonably safe environment for their inmates, including Plaintiff. At a minimum, they had a duty to keep her from being unlawfully assaulted by their employees, including KNIGHT and DOES, which was foreseeable based upon their past instances of misconduct, which were known to the senior officers and supervisors in NCSD and NCCC.

140.   In fact, it was well known throughout the community that multiple corrections officers, including KNIGHT and DOES, were using their actual and/or apparent authority to harass and torment vulnerable inmates without reason and without any legal basis.

141.   Despite having this knowledge, Defendants COUNTY and LaROCCO failed to take any remedial measures to prevent foreseeable acts of abuse by corrections officers.

142.   The countenancing of this behavior created an environment within NCSD and NCCC wherein corrections officers were allowed to continue with their violent behavior, which led to the Constitutional rights of vulnerable citizens being violated for their desires, including Plaintiff.

143.   Defendants COUNTY and LaROCCO intentionally failed to adequately supervise, control, oversee, train, and/or monitor KNIGHT and/or DOES, who had a history of engaging in official misconduct, and failed to implement measures to prevent KNIGHT and/or DOES and other corrections officers from conspiring with each other to cover up their official misconduct.

144.   Defendants COUNTY and LaROCCO intentionally failed to adequately supervise, control, oversee, train, and/or monitor KNIGHT and/or DOES and other corrections officers from conspiring with each other to cover up their official misconduct and prevent them from continuously violating the Constitutional rights of individual inmates, including Plaintiff.

145.   Defendants COUNTY and LaROCCO negligently hired, retained, and/or supervised KNIGHT and/or DOES when they knew or should have known that KNGHT and/or DOES posed a threat of abuse to vulnerable inmates.

146.   Defendants COUNTY and LaROCCO knew or should have known of KNIGHT and DOES' violent propensities for the conduct which caused Plaintiff's injuries, prior to the

occurrence of the injuries, given the knowledge of other instances of abuse that predate March 9, 2025.

147.   Defendants COUNTY and LaROCCO owed a duty of care to all persons, including Plaintiff, who were likely to come under the influence of KNIGHT and/or DOES in their roles as corrections officers, to ensure that KNIGHT and/or DOES did not abuse their authority as corrections officers to injure inmates by subjecting them to abuse for no lawful reason.

148.   At all times relevant hereto, Defendants' actions were willful, wanton, malicious, reckless, and/or outrageous in their disregard for the rights and safety of Plaintiff.

149.   Upon information and belief, Defendants COUNTY and LaROCCO were aware that there was a substantial likelihood that permitting KNIGHT and/or DOES to carry on their regular duties as corrections officers would deprive the inmates of their civil rights but failed to take adequate measures to resolve the wrong.

150.   In fact, upon hearing the allegations, Defendants COUNTY and LaROCCO still failed to take any action and failed to terminate KNIGHT and/or DOES' employment or title as corrections officers, essentially countenancing this behavior throughout NCCC.

151.   LaROCCO and other NCSD and NCCC supervisors' failure and refusal to adequately investigate KNIGHT and/or DOES' actions, acquiescence in KNIGHT and/or DOES' conduct, failure to take any remedial action against KNIGHT and/or DOES, allowing KNIGHT and/or DOES to remain employed as officers with COUNTY, deliberate indifference in their supervision of KNIGHT and/or DOES, and deliberate indifference to the rights of others by failing to act on information that Constitutional rights were being violated by KNIGHT and/or DOES and/or other corrections officers, subjects them to supervisory liability for the treatment Plaintiff was forced to endure beginning March 9, 2025.

152. As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to be unlawfully placed in substantial fear for her life, sustained bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

## COUNT VIII
## DENIAL AND FAILURE TO PROVIDE MEDICAL TREATMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS
### (*Against All Defendants*)

153. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

154. Defendants had an affirmative duty to provide and administer health and medical services to Plaintiff and other NCCC pre-trial detainees.

155. Defendants, as previously alleged, had a duty and obligation to provide Plaintiff and other pre-trial detainees of the NCCC reasonable and adequate health and medical services.

156. Defendants, on information, had knowledge that the health care they provided and/or were responsible for providing to Plaintiff and other pre-trial detainees of the NCCC was deficient, inadequate, and incompetent.

157. On information, the health and medical care provided by Defendants, or which they were responsible for providing, to Plaintiff failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology, and current beliefs about human decency.

158. On information, the health and medical care provided by Defendants, or which they were responsible for providing, created an excessive risk to Plaintiff, and the harm to which Plaintiff was exposed was sufficiently serious as to implicate her Constitutional rights.

159. On information, Defendants knew that Plaintiff's medical condition constituted a serious need for competent and adequate medical care and treatment.

160. On information, Defendants knew of and ignored the aforesaid excessive risk to Plaintiff's health.

161. The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury, or death was likely.

162. Defendants' policies, practices, customs, actions, and failures to act constituted deliberate indifference to the serious medical needs of Plaintiff.

163. Defendants were deliberately indifferent to the serious medical needs of Plaintiff.

164. As a direct and proximate result of the foregoing, Plaintiff was subjected to great physical and emotional pain and suffering.

165. Defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Plaintiff.

166. As a direct and proximate result of the foregoing, Plaintiff was subjected to cruel and unusual punishment and denial of adequate medical care and treatment.

167. As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to be unlawfully placed in substantial fear for her life, sustained bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical

and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees.

## COUNT IX
## MONELL
### (*Against Defendants COUNTY and LaROCCO*)

168.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

169.    Upon information and belief, it was the custom, policy, and practice of COUNTY and LaROCCO to tolerate, condone, and encourage Constitutional violations and violations under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12132, which created an environment where foreseeable Constitutional violations by the corrections officers were rampant, including the violations of Plaintiff's Constitutional rights by KNIGHT and/or DOES, such as those alleged by Plaintiff above, by failing to properly punish, charge, reprimand, and investigate allegations and incidents of misconduct by corrections officers.

170.    Defendants COUNTY and LaROCCO's policy, custom, pattern, and practice of such Eighth and Fourteenth Amendment violations, as well as violations under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12132, have materialized in serious harm to NCCC pre-trial detainees repeatedly.

171.    Specifically, COUNTY and LaROCCO have a policy and practice of allowing and fostering Constitutional violations at NCCC and inhumane living conditions by allowing and permitting their corrections officers to go unpunished and undisciplined in permitting such

Constitutional violations to exist and such inhumane living conditions which present a danger to NCCC pretrial detainees.

172.   In doing so, COUNTY and LaROCCO implement and accede to a policy and practice that deprives inmates of their Constitutional rights and the baseline civilized requirements of life's necessities, that intentionally or recklessly subjects them to unnecessary and wanton infliction of pain, that imposes punishment that is cruel and unusual, and that violates inmates' rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.

173.   Defendants COUNTY and LaROCCO's policy, custom, pattern, and practice of such First, Eighth, and Fourteenth Amendment violations have materialized in serious harm to NCCC pre-trial detainees repeatedly.

174.   For Plaintiff in particular, Defendants COUNTY and LaROCCO's illegal policy has caused her to incur physical, emotional, psychological, and pecuniary harms.

175.   Employees of COUNTY and LaROCCO, such as the Individual Defendants in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or punishment for their conduct and, further, that they would be indemnified from civil liability regardless of the illegality or unconstitutionality of their actions.

176.   By failing to supervise, train, and reprimand such corrections officers, COUNTY and LaROCCO caused the injuries to Plaintiff through the actions and inactions of KNIGHT and/or DOES.

177.   By maintaining a *de facto* policy of automatic indemnification, COUNTY and LaROCCO further caused the injuries to Plaintiff through the actions and inactions of the Individual Defendants.

178. Upon information and belief, this custom, policy, and practice of COUNTY and LaROCCO to ignore complaints and/or violations of religious freedoms and/or widespread allegations of inhumane living conditions, created an environment where foreseeable Constitutional violations by the corrections officers were rampant, including the violations of Plaintiff's Constitutional rights by the Individual Defendants.

179. COUNTY and LaROCCO's failure to take action against the Individual Defendants involved in these incidents and in other similar incidents is part of a custom, practice, and procedure of neglect and deliberate indifference that directly caused the injuries to Plaintiff.

180. As authorized representatives of Defendants COUNTY and LaROCCO, the corrections officers' conduct constituted a custom, policy, and practice which renders Defendants COUNTY and LaROCCO liable to Plaintiff as a "Person" acting under the color of state law.

181. These customs, policies, and practices which were enforced by Defendants COUNTY and LaROCCO were the moving force, proximate cause, or affirmative link behind the conduct causing Plaintiff's injuries.

182. Had COUNTY investigated serious complaints and/or widespread allegations of same prior to March 9, 2025, DOES would not have been in a position to violate Plaintiff's Constitutional rights.

183. COUNTY and LaROCCO are therefore liable for violations of Plaintiff's Constitutional rights as caused by the Individual Defendants, as described in more detail in the foregoing paragraphs; and Plaintiff has suffered damages therefrom.

184. That, by virtue of COUNTY, LaROCCO, and other NCCC Supervisors' failure and refusal to adequately investigate the Individual Defendants' actions, acquiescence in the Individual Defendants' conduct, failure to take any remedial actions against the Individual Defendants,

allowing the Individual Defendants to remain employed as officers with NCCC, gross negligence in their supervision of the Individual Defendants, and deliberate indifference to the rights of others by failing to act on information that Constitutional rights were being violated by the Individual Defendants, Defendants COUNTY and LaROCCO, which employed these corrections officers and policymakers during the relevant time period, exhibited a *de facto* custom, policy, or practice of unconstitutional conduct sufficient for the imposition of municipal liability under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

185.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees.

## COUNT X
## NEGLIGENT/GROSS NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION (PENDENT)
### *(Against Defendants COUNTY and LaROCCO)*

186.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

187.    Defendants knew, or were negligent in not knowing, that Defendants KNIGHT and DOES posed a threat to vulnerable inmates, including Plaintiff.

188.    Defendants COUNTY and LaROCCO, by and through their agents, servants, and/or employees, had actual knowledge, knew, or reasonably should have known of Individual

32

Defendants' dangerous and violent propensities and/or that Individual Defendants were unfit agents due to neglect of duty and prior instances of official misconduct.

189.   Defendants COUNTY and LaROCCO, by and through their agents, servants, and/or employees, failed to implement the proper programs and/or internal guidelines and regulations to adequately screen officers before they are allowed to continue to perform their full duties as corrections officers, after receiving knowledge of prior instances of misconduct.

190.   The acts of Individual Defendants described hereinabove were undertaken and/or enabled by and/or during the course and/or within the scope of their employment, appointment, and/or agency with NCCC.

191.   Defendants COUNTY and LaROCCO owed Plaintiff a duty to protect her from corrections officers with violent or cruel propensities and/or to implement the proper programs and/or internal guidelines and regulations to adequately screen such officers.

192.   Defendants COUNTY and LaROCCO owed Plaintiff a duty to protect her from the unlawful denial of necessary medical treatment.

193.   The countenancing of this behavior created an environment within the NCCC wherein certain corrections officers were allowed to continue with their unlawful behavior without ever facing an investigation into same or fearing any repercussions for their malfeasance, which led to the Constitutional rights of vulnerable inmates being violated for their violent desires.

194.   Defendants COUNTY and LaROCCO's willful, wanton, grossly negligent, and/or negligent acts of commission and/or omission, directly and/or proximately caused the damages set forth herein at length.

195.   In fact, upon hearing of the allegations, Defendants COUNTY and LaROCCO still failed to take any action and failed to terminate Individual Defendants' employment or title as corrections officers, essentially countenancing this behavior throughout the NCCC.

196.   As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, negligent, and deliberately indifferent actions, Plaintiff was caused to be placed in substantial fear for her life, sustained bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00).

### COUNT XI
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (PENDENT)
### *(Against Defendants LaROCCO, KNIGHT, and DOES)*

197.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

198.   By turning a blind eye toward actual knowledge of Individual Defendants' conduct, by employing Individual Defendants, and by choosing to place Individual Defendants in positions wherein they could work unsupervised, Defendant LaROCCO caused Plaintiff to be unlawfully denied necessary hormone replacement therapy.

199.   Defendants LaROCCO, KNIGHT, and DOES acted with extreme and outrageous conduct, which intentionally and/or recklessly caused severe emotional distress and bodily harm to Plaintiff.

200.  Individual Defendants, in their unlawful intentional conduct towards Plaintiff, acted with extreme and outrageous conduct that would shock the conscience of a reasonable person, when Plaintiff was denied necessary medical treatment, and caused to endure boils, cysts, abscesses, hot flashes, cold sweats, delirium, confusion, and emotional outbursts. This conduct was atrocious and transcended all bounds of decency, such that this conduct would be utterly intolerable in a civilized society.

201.  Plaintiff suffered severe emotional distress, including severe mental anguish, due to Defendants' intentional and/or reckless, extreme, and/or outrageous conduct.

202.  As a proximate result of Defendants' intentional, wanton, reckless, and deliberately indifferent actions, Plaintiff was caused to be unlawfully denied medical care, placed in substantial fear for her life, sustained bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages as to the Individual Defendants.

## COUNT XII
## PENDANT STATE CLAIM – *RESPONDEAT SUPERIOR*
### (*Against Defendant COUNTY*)

203.  Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

204.    By virtue of Individual Defendants' employment with Defendant COUNTY and their actions within their scope of their employment, Defendant COUNTY is liable for Individual Defendants' actions under a theory of *respondeat superior*.

205.    As a result of the above-described conduct, Plaintiff was caused to be unlawfully placed in substantial fear for her life, sustained bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, damage to her reputation, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00).

## JURY DEMAND

206.    Plaintiff demands a Trial by Jury of all causes of action so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

A.    Under the First Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

B.    Under the Second Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

C.    Under the Third Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

D.    Under the Fourth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

E.      Under the Fifth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

F.      Under the Sixth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

G.      Under the Seventh Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

H.      Under the Eighth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees;

I.      Under the Ninth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages and attorney's fees;

J.      Under the Tenth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), punitive damages and attorney's fees;

K.      Under the Eleventh Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00), plus punitive damages;

L.      Under the Twelfth Count, in the amount of FIVE MILLION DOLLARS ($5,000,000.00);

M.      Costs and disbursements of this action; and

N.      Such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
          August 4, 2026                          **HORN WRIGHT, LLP**
                                                  *Attorneys for Plaintiff*

                              By:    */s/Pablo A. Fernandez*
                                     Pablo A. Fernandez
                                     400 Garden City Plaza, Suite 500
                                     Garden City, New York 11530
                                     Tel: 516.355.9696
                                     paf@hornwright.com

37